

FILED

Oct 19 2018, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Brian Woodward
Woodward Law Offices, LLP
Merrillville, Indiana

ATTORNEY FOR APPELLEE

Tula Kavadias
Kavadias & Associates, PC
Crown Point, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Paternity of C.B. and
S.B.

Gregory W. Brown,

*Appellant-Petitioner,*

v.

Kara Davis,

*Appellee-Respondent*

October 19, 2018

Court of Appeals Case No.
45A03-1711-JP-2810

Appeal from the Lake Superior
Court

The Honorable John M. Sedia,
Special Judge

Trial Court Cause Nos.
45D06-1504-JP-402, -403

**Crone, Judge.**

# Case Summary

Gregory W. Brown ("Father") filed petitions to establish paternity to C.B. and S.B. ("the Children"), whose mother is Kara Davis ("Mother"). The parties stipulated to paternity. After a hearing, the trial court issued an order awarding Mother sole legal and physical custody of the Children, granting Father parenting time, and directing Father to pay child support. Mother filed a motion to correct error. The trial court issued an order granting the motion in part and denying it in part. Father filed a notice of appeal from the original order, and Mother cross-appealed. Father challenges the trial court's custody, parenting time, and child support rulings. Mother also challenges the child support ruling and argues that Father forfeited his right to appeal by failing to comply with the appellate rules. We conclude that Father did not forfeit his right to appeal, and we affirm the custody and parenting time rulings, but we reverse the child support ruling and remand for reconsideration consistent with this decision.

# Facts and Procedural History[1]

Mother and Father started living together in 2006. C.B. was born in 2007, and S.B. was born in 2011. In 2015, Mother obtained a protective order against Father. Father filed petitions to establish paternity to each child, and those actions were consolidated. The parties stipulated to paternity, entered into an agreed provisional order to share custody of the children, and then filed several dueling contempt petitions. The trial court patiently endured seven days of extremely contentious hearings on the paternity and contempt petitions from February through October 2017. On October 30, 2017, the trial court issued an order awarding Mother sole legal and physical custody of the Children, granting Father parenting time, directing Father to pay child support, and denying the parties' contempt petitions.

On November 13, 2017, Mother filed a motion to correct error as to child support. On November 16, the trial court issued an order granting the motion in part as to paragraphs 6 and 7 of the October 30 order, which it revised accordingly, and denying it in all other respects. On November 30, Father filed a notice of appeal from the October 30 order that does not mention or include a

---

[1] Father's statement of facts is inappropriately argumentative and contrary to the applicable standard of review in violation of Indiana Appellate Rule 46(A)(6)(b). Also, both parties included copies of multiple exhibits in their appendices. Appellate Rule 50(F) provides that "parties should not reproduce any portion of the Transcript in the Appendix[,]" and Appellate Rule 2(K) defines "Transcript" as "the transcript or transcripts of all or part of the proceedings in the trial court … and any exhibits associated therewith." That said, Appellate Rules 50(A)(2)(g) and 50(A)(3) provide that appendices shall contain "short excerpts from the Record on Appeal …, such as essential portions of a contract or pertinent pictures, that are important to a consideration of the issues raised on appeal[.]" We caution the parties not to include nonessential information in the appendix in future appeals.

copy of the November 16 order. Father raises several issues in his appellant's/cross-appellee's brief, and Mother raises several issues in her appellee's/cross-appellant's brief. Additional facts will be provided below.

## Section 1 – Father did not forfeit his right to appeal.

[4] We first address Mother's contention that Father forfeited his right to appeal by allegedly failing to comply with Indiana Appellate Rule 9. Appellate Rule 9(F)(3)(b) provides that an appellant's notice of appeal must include "[t]he date on which any Motion to Correct Error was denied or deemed denied, if applicable[.]" Mother complains that Father's notice of appeal does not include the date of the November 16 order, but she ignores the fact that her motion to correct error was granted in part. Appellate Rule 9(F)(8)(b) provides that "[a] copy of the order denying the Motion to Correct Error, or, if deemed denied, a copy of the Motion to Correct Error, if applicable[,]" must be attached to the notice of appeal. Mother complains that Father did not attach a copy of the November 16 order to his notice of appeal, but again she ignores the fact that her motion to correct error was granted in part. It is true, as Mother observes, that the November 16 order addresses child support, which Father raises in his brief, but it is also true, as Father points out, that he disagrees with both orders on this issue. Even if the spirit of the rule would require (and the better practice might have been for) Father to mention both orders in his notice of appeal and attach a copy of both orders, Mother cites no persuasive authority for the proposition that Father forfeited his right to appeal any or all of the issues raised in his brief by failing to do so.

# Section 2 – The trial court's custody ruling is not clearly erroneous.

Next, we address Father's contention that the trial court erred in awarding Mother sole legal and physical custody of the Children. The trial court made findings of fact and conclusions thereon at the parties' request pursuant to Indiana Trial Rule 52(A). In reviewing such findings, we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *In re Paternity of M.R.A.*, 41 N.E.3d 287, 292-93 (Ind. Ct. App. 2015). We "shall not set aside the findings or judgment unless clearly erroneous …." *Id.* at 293 (quoting Ind. Trial Rule 52(A)). "A judgment is clearly erroneous when there is no evidence supporting the findings, when the findings fail to support the judgment, or when the trial court 'applies the wrong legal standard to properly found facts.'" *Id.* (quoting *K.I. ex rel. J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009)). "In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor reassess the credibility of the witnesses. Rather we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them." *In re Paternity of B.M.*, 93 N.E.3d 1132, 1135 (Ind. Ct. App. 2018) (citation omitted). "Although we give considerable deference to trial courts in family law matters, 'to the extent a ruling is based on an error of law or is not supported by the evidence, it is reversible, and the trial court has no discretion to reach the wrong result.'" *M.R.A.*, 41 N.E.3d at 293 (quoting *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 941 (Ind. 2005)).

Initial custody determinations in paternity actions are governed by Indiana Code Section 31-14-13-2, which reads in relevant part as follows:

> The court shall determine custody in accordance with the best interests of the child. In determining the child's best interests, there is not a presumption favoring either parent. The court shall *consider* all relevant factors, including the following:
>
> (1) The age and sex of the child.
>
> (2) The wishes of the child's parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
> > (A) the child's parents;
> >
> > (B) the child's siblings; and
> >
> > (C) any other person who may significantly affect the child's best interest.
>
> (5) The child's adjustment to home, school, and community.
>
> (6) The mental and physical health of all individuals involved.
>
> (7) Evidence of a pattern of domestic or family violence by either parent.

(Emphasis added.)

Indiana Code Section 31-14-13-2.3(a) allows the court to award the parties joint legal custody "if the court finds that an award of joint legal custody would be in the best interest of the child." The statute further provides,

> (b) An award of joint legal custody under this section does not require an equal division of physical custody of the child.
>
> (c) In determining whether an award of joint legal custody under this section would be in the best interest of the child, the court shall consider it a matter of primary, but not determinative, importance that the persons awarded joint legal custody have agreed to an award of joint legal custody. The court shall also *consider*:
>
>> (1) the fitness and suitability of each of the persons awarded joint legal custody;
>>
>> (2) whether the persons awarded joint legal custody are willing and able to communicate and cooperate in advancing the child's welfare;
>>
>> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;
>>
>> (4) whether the child has established a close and beneficial relationship with both of the persons awarded joint legal custody;
>>
>> (5) whether the persons awarded joint legal custody:
>>
>>> (A) live in close proximity to each other; and
>>>
>>> (B) plan to continue to do so;

> (6) the nature of the physical and emotional environment in the home of each of the persons awarded joint legal custody; and
>
> (7) whether there is a pattern of domestic or family violence.

(Emphasis added.)

[8] In its October 30 order, the trial court made the following findings regarding custody:[2]

> At first blush, it's obvious that this family has many aspects of which both Father and Mother should be proud: C.B. and S.B. are, for the most part, two bright, well-adjusted and well-behaved children; and Father, his mother, and Mother's extended family, including Mother's daughter A.[S.], are active and involved in all aspects of the children's lives. In short, C.B. and S.B. are surrounded by adults who love, nurture and support them. There is nothing unusual or untoward about any of the mishaps that have befallen them in their activities with Father, Mother and their families, and nothing to suggest negligence or malfeasance by Father, Mother or any family members while caring for C.B. and S.B.
>
> Father's parenting style is not inappropriate, but he tends to lose patience more quickly with the kinds of behavioral issues common among boys of the same age as C.B. and S.B. He also pushes the boys to excel at athletic activities, crossing the line at times between encouragement and force. Mother's parenting style, likewise not inappropriate, is more loving and nurturing

---

[2] In this and other excerpts from the trial court's orders, we have replaced references to the parties' and the Children's names with the abovementioned designations.

than Father's, but sometimes crosses the line between being reasonable and being lackadaisical. These opposing parenting styles confuse the boys.[3]

Unfortunately, as is the situation which turns paternity matters into contested cases, Father and Mother do not share the same love, nurture and support for each other that they do with C.B. and S.B. In particular, Father, who testified that he wants nothing more than to cooperate with Mother to the benefit of the children, belies this testimony with his actions:

… this GAL [guardian ad litem] believes that he [Father] truly loves his children and wants to do what is best for them. However, this GAL believes that Father holds a great deal of animosity for Mother and her family. His behavior during this litigation has been that of an attorney instead of a Father. It has come to the attention of the GAL that Father has sued Maternal Grandparents for neglect as a result of a dog bite incident.… In addition, Father has attempted to block Mother from moving into a new home that Maternal Grandparents purchased in Lowell. Most recently this GAL has learned that Father is attempting to force Mother's attorney to withdraw as her counsel of record. While these actions may be well within Father's right to do so legally,[4] it perplexes this GAL that Father has not considered the impact these actions have on the children. Had Father been successful on all fronts, Mother would be without employment, without a home, and without a support system to help her care for these children. Yet Father believes that he has done nothing wrong. These actions have only served to create more conflict between the Parties and their families than what already existed, GAL Report filed 12/1/2015, page 6.

---

[3] Father argues that this finding "is not supported by any evidence in the record." Appellant's Br. at 16. In fact, the guardian ad litem made a similar statement in her report. *See* Appellee's App. Vol. 2 at 58 ("The difference in the two parenting styles can be confusing for the children.").

[4] Father fails to acknowledge this caveat.

Mother is not blameless in contributing to the toxic relationship between these parents, but Father's actions have ramped the toxins up to an intolerable level that is beginning to have a negative effect upon C.B. and S.B. Father's objective in this case, as stated in open court, is to win. This objective is contrary to the letter and spirit of the Lake County Rules of Family Law, which is:

Research establishes that how parents conduct themselves during a domestic relations proceeding has a greater impact on their children than the proceeding itself. These local rules have been enacted to help effectuate a dignified and effective means of resolving all family law disputes, but especially those disputes involving minor children. While recognizing our adversarial system for resolving family law problems, these local rules mandate that attorneys not ignore but embrace their equally important roles as negotiators and advisors and their special responsibility for the quality of justice.

Moreover, there is a complete inability by Father and Mother to communicate effectively, even regarding the simplest issues, regarding the boys. Many parenting time exchanges have turned into battles royal, and have exposed S.B. and C.B. to inappropriate and destructive behavior. Communications regarding the boys are often laced with invective and vitriol. Accusations fly regarding Father not telling Mother about significant events that happen while the boys are in his custody and Mother interfering with Father's parenting time. In short, the joint custody arrangement is not working and is beginning to have a detrimental effect upon C.B. and S.B.

[….]

After considering all the factors set forth in I.C. 31-14-3-2 and I.C. 31-14-13-2.3, and the inability of Father and Mother to successfully parent their children without undue contention and

acrimony, and that Mother has a loving and nurturing extended family and support system, it is in the best interests of C.B. and S.B. that Mother have sole legal and physical custody of C.B. and S.B., with Father having appropriate parenting time to remain an active and participating parent in their lives.

October 30 Order at 1-3.

[9] Most of Father's numerous complaints about the trial court's findings, including the quotation from the GAL's report,[5] are essentially requests to reweigh evidence or reassess witness credibility in his favor, which we may not do. Father complains that certain findings, including those regarding Mother's extended family, are either insufficiently specific to permit meaningful review or unsupported by the record, which is simply untrue. *E.g.*, *supra* n.3.[6] Father asserts that the trial court was required to make findings on each factor in Indiana Code Sections 31-14-3-2 and 31-14-3-2.3, which is also untrue; the statutes require only that the trial court "consider" those factors, and the court specifically stated that it did so in this case. *See In re Marriage of Ford*, 470 N.E.2d 357, 363 (Ind. Ct. App. 1984) (stating that similarly worded dissolution custody statute "only requires that the court *consider* all relevant factors. Specific findings on each of the listed factors are not required."), *trans. denied*

---

[5] Although the trial court did not explicitly adopt that portion of the report, it is clear from the context that the court agreed with the GAL's assessment.

[6] The record contains ample testimony regarding Mother's extended family, which obviously was an important factor in the trial court's custody determination. *See, e.g.*, Tr. Vol. 5 at 117-18 (Mother's testimony regarding extended family and frequency of interactions). Father cites no authority for his suggestion that the trial court was required to enter minutely detailed findings about Mother's family in its order.

(1985).  In sum, Father has failed to establish that the trial court's custody ruling is clearly erroneous.

## Section 3 – The trial court's parenting time ruling is not clearly erroneous.

In its October 30 order, the trial court reduced the parenting time that Father had received under the agreed provisional order to an amount above the minimum specified by the Indiana Parenting Time Guidelines.  October 30 Order at 4.  In his initial brief, Father contends that the issue is controlled by Indiana Code Section 31-17-4-2, which states,

> The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child.  However, the court shall not restrict a parent's parenting time rights unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development.

Because the trial court made no finding of endangerment, Father asserts that the court improperly restricted his parenting time.  In her brief, Mother observes that this Court has held that the reduction of parenting time to an amount consistent with the Parenting Time Guidelines is not a restriction of parenting time for purposes of Section 31-17-4-2 and therefore does not require a finding of endangerment.  *Clary-Ghosh v. Ghosh*, 26 N.E.3d 986, 991 (Ind. Ct. App. 2015), *trans. denied*.

In his reply brief, Father argues for the first time that Indiana Code Section 31-14-14-1 controls, and he distinguishes *Clary-Ghosh* on the basis that it was a

marital dissolution proceeding.[7]  Father's sudden about-face is not well taken[8] and not persuasive.  Section 31-14-14-1 applies to an initial determination of parenting time rights in paternity proceedings and states in pertinent part, "A noncustodial parent is entitled to reasonable parenting time rights unless the court finds, after a hearing, that parenting time might:  (1) endanger the child's physical health and well-being; or (2) significantly impair the child's emotional development."  Ind. Code § 31-14-14-1(a).  Assuming, as Father apparently does, that the trial court's parenting time ruling was an initial determination because the provisional order was agreed to by the parties, we note that he cites no authority for his suggestion that an award of parenting time above the minimum specified by the Parenting Time Guidelines is unreasonable. Consequently, no finding of endangerment was required.[9]  Father has failed to establish that the trial court's parenting time ruling is clearly erroneous.

## Section 4 – The trial court's child support ruling is clearly erroneous in certain respects.

[12]    As modified by its November 16 order, the trial court made the following findings and conclusions regarding child support:

---

[7] Indiana Code Article 31-17 (which includes Section 31-17-4-2) governs custody and visitation rights in marital dissolution, separation, and support proceedings.  Ind. Code § 31-17-2-3(1).

[8] "[A] party may not raise a new argument in a reply brief."  *Schilling v. Huntington Cty. Cmty. Sch. Corp.*, 898 N.E.2d 385, 390 n.1 (Ind. Ct. App. 2008), *trans. denied* (2009).

[9] Indiana Code Section 31-14-14-2 states that "[t]he court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child."  No finding of endangerment is required here, either.  Thus, regardless of which statute Father would ultimately choose to hang his hat on, his argument would fail.

Calculation of child support in this case is complicated by the fact that Father, through his hard work and legal skill, earned a substantial attorney fees in the amount of $3,457,000.00 as one of the plaintiff's attorneys in the case of Zak v. J.B. Hunt Transport, Inc. Father set up [a] structured settlement agreement for the payment of his fee to him. The way the payment was structured in this agreement, Father would receive less than one-third of the fee prior to S.B. turning 19 and the balance afterward. His first payment under the agreement, in the amount of $100,000, was made February 1, 2017.[10]

Father and Mother produced Certified Public Accountants as expert witnesses who opined as to when Father was in constructive receipt of the fee he earned for purposes of taxation. Not surprisingly, Mother's expert was of the opinion that the fee should be deemed constructively received and, therefore, taxable for the year 2016; and Father's expert opined that the fee was not constructively received in the year 2016, and the income derived from the structured settlement agreement was taxable income after its approval by the probate court in January, 2017.

The Preface to Guideline 1. of the Indiana Child Support Guidelines provides as follows:

Guidelines to determine levels of child support and educational support were developed by the Judicial Administration Committee of the Judicial Conference of Indiana and adopted by the Indiana Supreme Court. The guidelines are consistent with the provisions of Indiana Code Title 31 which place a duty for child support and educational support upon parents based upon

---

[10] The agreement provides that Father's law firm will receive $100,000 per year for eight years (February 2017 through February 2024), $150,000 per year for five years (February 2025 through February 2029), and $494,500 per year for eight years (February 2029 through February 2036). Mother's Ex. 37. The agreement provides that the payments "cannot be accelerated, deferred, increased or decreased" by Father or his firm. *Id.*

their financial resources and needs, the standard of living the child would have enjoyed had the marriage not been dissolved or had the separation not been ordered, the physical or mental condition of the child, and the child's educational needs […].

This notion that one of the factors to be considered in calculating child support is the standard of living the child would have enjoyed had the family unit remained intact has ample support under Indiana case law.

The key in determining the appropriate income attributable to Father resulting from his earning the attorney fee in Zak which is essential to calculating the appropriate amount of child support he should pay for C.B. and S.B. is not when he was considered to have received the fee for purposes of federal income tax, but rather when the boys would have begun to enjoy the standard of living such a large attorney fee would have brought to this family had their family unit remained intact.

The plaintiff Father represented in the Zak case was an incapacitated person for whom a guardianship had been established in the Lake Circuit Court, Probate Division. Approval by that Court was required prior to the distribution of any of the proceeds of the case to this plaintiff, including Father's attorney fees. That approval was obtained on December 29, 2016. Father had no access to his fee prior to that date; would not have had access to his fee prior to that date had he, Mother and the boys been an intact family; and, most importantly, C.B. and S.B. would not have been able to enjoy the standard of living that such a large fee would have brought to their family until December 29, 2016.

What, then, is the appropriate measure of Father's income that must be considered in calculating his child support obligation after December 29, 2016? It certainly is not the income stream set up in the structured settlement agreement: less than one-third of the principal amount of the fee will be paid out by S.B.'s 19th

birthday. Whether or not Father structured the agreement in this manner in an attempt to minimize his child support obligation, to provide for himself during his retirement years, or for tax liability allocation purposes, or for all three reasons, is not relevant to the analysis the Court must make in determining Father's income to calculate child support. C.B. and S.B. are entitled to benefit from the full amount of Father's fee, including the interest it would generate. The structured settlement agreement provides for this, as its total payments, principal and interest, amount to $5,506,000 over twenty years, or one thousand forty weeks. This extrapolates to a weekly income over the life of the agreement of $5,294.

Mother's current annual income is $25,452 which extrapolates to a weekly income of $489.

To calculate the gross income for Father, for the time period from April 27, 2015 through December 29, 2016, the guidance provided by the Indiana Child Support Guidelines as set forth in the Commentary to Guideline 3 is instructive:

a. Self-Employment, Rent and Royalty Income. Calculating Weekly Gross Income for the self-employed or for those who receive rent and royalty income presents unique problems, and calls for careful review of expenses. The principle involved is that actual expenses are deducted, and benefits that reduce living expenses (i.e. company cars, free lodging, reimbursed meals, etc.) should be included in whole or in part. It is intended that actual out-of-pocket expenditures for the self-employed, to the extent that they are reasonable and necessary for the production of income, be deducted. Reasonable deductions for capital expenditures may be included. While income tax returns may be helpful in arriving at Weekly Gross Income for a self-employed person, the deductions allowed by the Guidelines may differ significantly from those allowed for tax purposes.

Utilizing the above Commentary to Guideline 3, gross income

less actual expenses necessary to generate income, Father's annual income for this time period, using his 2015 personal income tax return and the S Corporation 2015 income tax return for his law practice and other business enterprises, is calculated to be $57,000, which extrapolates to a total income of $95,365 for the 87 weeks between April 27, 2015 through December 29, 2016, leaving a gross income calculation of $1,096 per week. Mother's income for this time period is $33,060, leaving a gross income calculation of $380 per week. Notwithstanding that Father has not yet filed his 2016 income tax returns, there was no persuasive evidence presented that the income from Father's law practice and business enterprises will be substantially higher or lower after his receipt of the Zak settlement.

Child support after December 29, 2016 should therefore be based upon a gross weekly income for Father of $6,390 and for Mother of $489, with Father given credit for overnight parenting time. Child support for the period from April 27, 2015 through December 29, 2016, a period of 87 weeks, should be based upon a gross weekly income for Father of $1,096 per week and a gross weekly income for Mother of $380 per week. Father should be given credit for the $14,188 he has paid in child support and for overnight parenting time. Father should also be entitled to claim federal and state income tax exemptions for both C.B. and S.B. for tax year 2016 and all subsequent tax years.

October 30 Order at 3-4 (citations omitted).

6. Father shall pay current child support in the amount of $533 per week payable to the State Central Unit pursuant to the Child Support Obligation Worksheet attached to this Order marked as Exhibit 1 together with an additional $67 per week to be credited to the arrearage of Father's child support obligation for a total support obligation of $600 per week, commencing November 3, 2017. Father'[s] arrearage is calculated as follows: Father's gross support obligation from April 27, 2015 through December 29,

2016, a period of 87 weeks, was $97 per week, as set forth on CSOW Exhibit 2, for a total of $8,439; and his support obligation from December 29, 2016 through November 3, 2017, a period of 44 weeks, was $403 per week, as set forth on CSOW Exhibit 3, for a total of $17,732. This is calculated to a gross arrearage of $26,171. Father paid $14,188 in child support during this time period. This amount is credited to Father, leaving a net arrearage of $11,983.

7. [….] Mother shall be entitled to claim the federal and state income tax exemptions for C.B. and S.B. for calendar year 2016 and Father shall be entitled to claim the federal and state income tax exemptions for C.B. and S.B. for all subsequent years.

November 16 Order at 1.

[13] Both parties raise several challenges to the trial court's child support ruling. "The paramount concern of a court in any case involving child support must be focused on the best interests of the child." *Ward v. Ward*, 763 N.E.2d 480, 482 (Ind. Ct. App. 2002). "A trial court's calculation of child support is presumptively valid." *Young v. Young*, 891 N.E.2d 1045, 1047 (Ind. 2008). "We will reverse a trial court's decision in child support matters only if it is clearly erroneous or contrary to law." *Id.* To the extent we address issues raised by Mother in her motion to correct error, we review the trial court's ruling on the motion for an abuse of discretion. *Tucker v. Tom Raper, Inc.*, 81 N.E.3d 1088, 1090 (Ind. Ct. App. 2017). "An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law." *Id.*

### *4.1 – The trial court did not clearly err in averaging the annuity payments.*

[14] In a paternity action, "the court may order either parent or both parents to pay any amount reasonable for support of a child … after considering all relevant factors, including" the custodial parent's financial resources, the standard of living the child would have enjoyed if the parents had been married and remained married to each other, the child's physical or mental condition and educational needs, and the noncustodial parent's financial resources and needs. Ind. Code § 31-16-6-1(a). "An infinite number of situations may prompt a judge to deviate from the Guideline amount." Ind. Child Support Guideline 1, cmt. "Judges must … avoid the pitfall of blind adherence to the computation for support without giving careful consideration to the variables that require changing the result in order to do justice." *Id.*

[15] "The first step in establishing a child support award is to determine the weekly gross income of each parent." *Scott v. Scott*, 668 N.E.2d 691, 695-96 (Ind. Ct. App. 1996). Indiana Child Support Guideline 3(A)(1) defines weekly gross income as "actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon 'in-kind' benefits." Weekly gross income "includes income from any source" and "includes, but is not limited to, income from salaries, wages, commissions, bonuses, overtime, partnership distributions, dividends, severance pay, pensions, interest, trust income, annuities, [and] capital gains[,]" among other things. *Id.*

[16] We first address Father's argument that the trial court erred in averaging the annuity payments that have been and will continue to be made to his law firm pursuant to the structured settlement agreement in the *Zak* case. He places heavy emphasis on Guideline 3(A)(1)'s mention of "actual income" and notes that in *Carmichael v. Siegel*, another panel of this Court concluded that this phrase "necessarily implies that the income be not only existing in fact but also currently received by the parent and available for his or her immediate use." 754 N.E.2d 619, 628 (Ind. Ct. App. 2001). But *Carmichael* did not involve a self-employed parent who is going to receive more than two-thirds of a negotiated multimillion-dollar payout after his younger child turns nineteen.

[17] In *Lloyd v. Lloyd*, the court observed that the commentary to Guideline 3(B) suggests that income averaging may be appropriate in certain circumstances:

> [o]ne pay stub standing alone can be very misleading, as can other forms of documentation. This is particularly true for salesmen, professionals and others who receive commissions or bonuses, *or others who have the ability to defer payments, thereby distorting the true picture of their income in the short term.* When in doubt, it is suggested that income tax returns for the last two or three years be reviewed.

755 N.E.2d 1165, 1169 (Ind. Ct. App. 2001) (emphasis added) (quoting Ind. Child Support Guideline 3, cmt.).

[18] Here, the trial court was well within its discretion to review the terms of the structured settlement agreement, pursuant to which Father deferred the lion's share of his substantial fee from the *Zak* case until after the Children turn

nineteen, and to average the annuity payments in calculating Father's weekly gross income so that the Children may benefit from the full amount of Father's fee. *Cf. Mehne v. Hess*, 553 N.W.2d 482, 489 (Neb. Ct. App. 1996) (allocating father's lump-sum personal injury award over fifteen years of children's minority instead of thirty-four years of father's working life for child support purposes in paternity proceeding because "spreading the settlement proceeds" over latter period "would lead to an untenable result … and would not be in the children's best interests."); *Cleveland v. Cleveland*, 592 A.2d 20, 23 (N.J. Sup. Ct. App. Div. 1991) (holding that where father elected to receive personal injury award payment every five years pursuant to structured settlement, trial court properly "allocated that sum as if received monthly until the next distribution" for child support purposes). Father has failed to establish clear error in this regard.[11]

### 4.2 – The trial court clearly erred in attributing annuity payments to Father before February 1, 2017.

[19]     Nevertheless, we agree with Father that the trial court clearly erred in attributing annuity payments to him before February 1, 2017, when he actually received the first payment pursuant to the settlement agreement, which was

---

[11] Father emphasizes that "[f]ederal law has approved and allowed the right of attorneys to defer contingent fee income over a twenty year period through tax regulation and case precedent." Appellant's Br. at 29. But federal law does not dictate how state courts may treat that income for child support purposes. Father also complains that the trial court erred in attributing the annuity payments to him instead of to his law firm, based chiefly on his assertion that "[t]he trial court erred when it failed to deduct any business expenses from the gross annuity structure scheduled to be paid to [the firm] ….. *Id*. at 27. We address the issue of expenses below, and we note that because Father's firm is a subchapter S corporation, "its income for purposes of federal and Indiana taxation is attributable to [him]." *Glass. v. Oeder*, 716 N.E.2d 413, 416 (Ind. 1999).

subject to the probate court's approval. Therefore, we reverse and remand with instructions to recalculate Father's weekly gross income prior to that date accordingly.

### 4.3 – The trial court did not clearly err on the issue of Father's law firm's expenses.

[20] Father also contends that the trial court erred in not deducting any ordinary and necessary expenses of his law firm, a subchapter S corporation, from the firm's gross receipts in calculating his weekly gross income. Guideline 3(A)(2) provides that weekly gross income from self-employment or operation of a business "is defined as gross receipts minus ordinary and necessary expenses." "In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed to restrict the deductions to reasonable out-of-pocket expenditures necessary to produce income." *Id*. The Guideline notes that weekly gross income "from self-employment may differ from a determination of business income for tax purposes." *Id*. As the Guideline suggests, "[t]he income included for guidelines purposes is more inclusive than that reported for income tax purposes, because specifically excluded from 'ordinary and necessary' expenses are depreciation, investment tax credits, and certain other business expenditures allowed by the IRS." *Bass v. Bass*, 779 N.E.2d 582, 593-94 (Ind. Ct. App. 2002) (quoting *DeBoer v. DeBoer*, 669 N.E.2d 415, 424 (Ind. Ct. App. 1996), *trans. denied*), *trans. denied* (2003). "[T]he trial court is vested with discretion regarding the validity of business

expenses and deductions taken for tax purposes by a business owner." *Id.* at 593 (quoting *Clark v. Madden*, 725 N.E.2d 100, 107 (Ind. Ct. App. 2000)).

[21]     We first observe that Father failed to file a child support worksheet with the trial court as required by the Guidelines, and thus he failed to present the court with his own verified calculation of his weekly gross income. *See* Ind. Child Support Guideline 3(B)(1) ("In all cases, a copy of the worksheet which accompanies these guidelines *shall* be completed and filed with the court when the court is asked to order support.… Worksheets *shall* be signed by both parties, not their counsel, under penalties for perjury.") (emphases added). We further observe that he failed to submit a 2016 corporate tax return or W-2 form at the hearing, which concluded in October 2017. Father notes that Mother submitted the corporate tax returns from 2011 through 2015, as well as the corporation's Quickbooks accounting data from 2016, and argues that the trial court "could have simply averaged the ordinary and necessary business expenses" using those exhibits. Appellant's Br. at 28. But this argument assumes that those expenses were all "reasonable out-of-pocket expenditures necessary to produce income." Ind. Child Support Guideline 3(A)(2). Mother points out that her expert challenged the propriety of various expenses and that Father admitted he could not vouch for their accuracy. Given all this, we conclude that Father has failed to establish clear error on this issue.

### *4.4 – Father has waived any argument regarding his FICA taxes and projected tax rate.*

[22] Father also argues that the trial court erred in failing to deduct half his FICA taxes and the difference between his projected tax rate of 44% (as calculated by Mother's expert) and the Guidelines' presumptive rate of 21.88% from its calculation of his weekly gross income. *See* Ind. Child Support Guideline 3(A) ("The self-employed shall be permitted to deduct that portion of their FICA tax payment that exceeds the FICA tax that would be paid by an employee earning the same Weekly Gross Income."); Ind. Child Support Guideline 1, cmt. (noting that "average tax factor of 21.88 percent was used to adjust the support column" for gross income methodology used in Guidelines and that "where taxes vary significantly" from that rate, "a trial court *may* choose to deviate from the guideline amount where the variance is substantiated by evidence at the support hearing.") (emphasis added). Mother asserts that Father did not request these deviations from the Guidelines in his pleadings or at trial, failed to produce evidence on these issues (including the amount of his FICA taxes and his projected tax rate), and failed to submit a child support worksheet, and therefore has waived consideration of this argument on appeal. We agree. *See GKC Ind. Theatres, Inc. v. Elk Retail Inv'rs, LLC*, 764 N.E.2d 647, 651 (Ind. Ct. App. 2002) ("As a general rule, a party may not present an argument or issue to an appellate court unless the party raised that argument or issue to the trial court.… The rule of waiver in part protects the integrity of the trial court; it cannot be found to have erred as to an issue or argument that it never had an opportunity to consider.").

### 4.5 – The trial court did not clearly err in calculating Father's weekly gross income.

More generally, Father argues that the trial court's calculation of his weekly gross income was "not supported by any economic theory of mathematical logic." Appellant's Br. at 36. He claims that "[t]he trial court used future values and then imputed current income based upon some unknown interest rate. There was no evidence in the record that such a calculation was feasible or mathematically correct." *Id.* at 37. We disagree. The trial court's primary consideration was to ensure that the Children benefit from the full amount of Father's fee from the *Zak* case, and it is undisputed that the total payout for the $3,457,000 fee will be $5,506,000 over twenty years. We have already concluded that the trial court did not clearly err in averaging the annuity payments, and we cannot conclude that the trial court clearly erred in using the total payout amount as the basis for its calculations.

### 4.6 – The trial court did not abuse its discretion in not imputing income to Mother.

Finally, Father contends that the trial court erred in not imputing income to Mother based on her "rent-free living arrangements" with her parents. Appellant's Br. at 37. Guideline 3(A)(1) provides that weekly gross income includes "imputed income based upon 'in-kind' benefits[.]" The Guideline's commentary states that whether "income should be imputed to a parent whose living expenses have been substantially reduced due to financial resources other than the parent's own earning capabilities is … a fact-sensitive situation

requiring careful consideration of the evidence in each case." The commentary further states,

> [R]egular and continuing payments made by a family member … that reduce the parent's costs for rent, utilities, or groceries, *may* be the basis for imputing income. If there were specific living expenses being paid by a parent which are now being regularly and continually paid by that parent's current spouse or a third party, the assumed expenses *may* be considered imputed income to the parent receiving the benefit.

*Id*. (emphases added). We will reverse a trial court's decision regarding imputation of income only for an abuse of discretion. *Miller v. Miller*, 72 N.E.3d 952, 954-55 (Ind. Ct. App. 2017).

[25] Father contends that "[t]here was no evidence in the record that [Mother] pays any living expenses, including, but not limited to, rent, water, sewer, gas and electric bills." Appellant's Br. at 37. He further contends that the trial court "arbitrarily" barred him "from inquiring about any expense paid on [Mother's] behalf less than $1,000.00, quashed his subpoena which requested household expenses from [Mother's mother], and barred [Father's] realtor James Langen from testifying about the fair rental value of the home." *Id*. at 38. He also argues that even though he "was prepared to testify about [Mother's] imputed income, the court ordered that it was limiting [his] testimony time to 35 minutes at the end of trial precluding [him] from testifying on this issue." *Id*.

[26] Mother points out that the trial court allowed Father to question her mother regarding household expenses, that Father did not object to the trial court's

time limits on the seventh and final day of contentious evidentiary hearings, and that Father has not appealed the quashing of his subpoena. The trial court excluded Langen on the basis that Father had failed to disclose him as a witness, and the parties disagree whether this was true. We need not resolve this particular dispute, however, because Father does not explicitly challenge Langen's exclusion. It was Father's burden to present evidence regarding the value of Mother's living expenses, if any, that were paid for by her parents for purposes of establishing imputed income, and he failed to meet this burden. Accordingly, we cannot say that the trial court abused its discretion in not imputing income to Mother.

### 4.7 – The trial court did not abuse its discretion in denying Mother's motion to correct error on the issue of Father's depreciation deductions.

[27]     Mother observes that Father "owns numerous rental units and that [he] enjoyed depreciation deductions on his income tax returns." Appellee's Br. at 59. According to Mother, Father's "2015 rental income (after adding back only the depreciation deduction and leaving all the other deductions) was $23,448.00 per his 2015 federal tax return." *Id.* (citing Appellee's App. Vol. 3 at 150-51). She notes that Guideline 3(A) provides that such deductions "should be carefully reviewed to restrict [them] to reasonable out-of-pocket expenditures necessary to produce income" and asserts that the trial court should have made findings "explaining whether the depreciation deductions taken by [Father] were indeed

necessary to produce income." Appellee's Br. at 59.[12] We conclude that such a finding is implicit in the trial court's order, which references "actual expenses necessary to generate income." October Order at 4. Mother cites no evidence to establish that the expenses were not necessary to generate income and therefore has failed to establish an abuse of discretion in the denial of her motion to correct error on this issue.

### 4.8 – Remand is appropriate on the issue of income tax exemptions.

[28]　Finally, Mother disagrees with the trial court's handling of the income tax exemptions for the Children under Child Support Guideline 9, which reads in relevant part as follows:

> Development of these Guidelines did not take into consideration the awarding of the income tax exemption. Instead, it is required each case be reviewed on an individual basis and that a decision be made in the context of each case. Judges and practitioners should be aware that under current law the court cannot award an exemption to a parent, but the court may order a parent to release or sign over the exemption for one or more of the children to the other parent pursuant to Internal Revenue Code § 152(e). To effect this release, the parent releasing the exemption must sign and deliver to the other parent I.R.S. Form 8332, Release of Claim to Exemption for Child of Divorced or Separated Parents. The parent claiming the exemption must then file this form with his or her tax return. The release may be made, pursuant to the Internal Revenue Code, annually, for a specified number of years or permanently. Courts shall include in the support order that a

---

[12] Father argues that Mother has waived this argument by failing to raise it before the trial court, but Mother notes that both parties' experts testified regarding this issue.

parent may only claim an exemption if the parent has paid at least ninety-five percent (95%) of their court ordered support for the calendar year in which the exemption is sought by January 31 of the following year. Shifting the exemption for dependents does not alter the filing status of either parent.

A court is required to specify in a child support order which parent may claim the child(ren) as dependents for tax purposes. In determining when to order a release of exemptions, it is required that the following factors be *considered*:

(1) the value of the exemption at the marginal tax rate of each parent;

(2) the income of each parent;

(3) the age of the child(ren) and how long the exemption will be available;

(4) the percentage of the cost of supporting the child(ren) borne by each parent;

(5) the financial aid benefit for post-secondary education for the child(ren);

(6) the financial burden assumed by each parent under the property settlement in the case; and

(7) any other relevant factors, (including health insurance tax subsidies or tax penalties under the Affordable Care Act).

(Emphasis added.)  A trial court's decision regarding the dependency exemption falls within the court's equitable discretion.  *Quinn v. Threlkel*, 858 N.E.2d 665, 674 (Ind. Ct. App. 2006).

[29]  Mother first contends (and Father agrees) that the trial court erred when "it rendered no written findings either justifying the re-allocation of the tax exemptions or mentioning any of the above-referenced factors."  Appellee's Br. at 57.  The Guideline requires only that the court consider those factors; it does not specifically require that the court mention them in its findings.  That being said, the lack of findings to justify the reallocation of the exemptions is a valid concern, given that the federal tax code automatically grants dependency exemptions to a custodial parent and Father did not request them here.  *Quinn*, 858 N.E.2d at 674; 26 U.S.C. § 152(e); *see also* Ind. Child Support Guideline 5 ("These Guidelines have been drafted in an attempt to comply with, and should be construed to conform with applicable federal statutes.").  Mother also contends that the trial court erred "by using language actually awarding the tax exemptions to [Father] rather than ordering that [Mother] sign the waiver form." Appellee's Br. at 57.  Based on the plain language of the Guideline, we agree.  Finally, Mother contends that the trial court erred in failing to include in its order that Father "may only claim an exemption if [he] has paid at least ninety-five percent (95%) of [his] court ordered support" by the applicable date, as required by Guideline 9.  We agree on this point as well and therefore remand with instructions for the court to reconsider this issue and amend its order accordingly.

# Conclusion

We affirm the trial court's custody and parenting time rulings. We reverse the trial court's child support ruling and remand for reconsideration consistent with this decision.

Affirmed in part, reversed in part, and remanded.

Bailey, J., and Brown, J., concur.