## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 15 2019, 9:23 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erik H. Carter
Carter Legal Services LLC
Noblesville, Indiana

ATTORNEY FOR APPELLEE

William P. Means
Roberts Means, LLC
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Marriage of: | April 15, 2019 |
| Brian Crump, | Court of Appeals Case No. 18A-DR-1924 |
| *Appellant-Respondent,* | Appeal from the Hamilton Superior Court |
| v. | The Honorable David K. Najjar, Judge |
| Angela Grannan, | Trial Court Cause No. 29D01-1404-DR-3879 |
| *Appellee-Petitioner* | |

**Vaidik, Chief Judge.**

# Case Summary

[1]     Brian Crump ("Father") appeals the trial court's order modifying physical custody of his two children.  He also argues that the trial court erred by failing

to impute income to Mother when determining the parties' child-support obligations. We affirm.

# Facts and Procedural History

Father and Angela Grannan ("Mother") were divorced in Hamilton Superior Court in July 2014. They have two children: A.C., who was born in 2007, and M.C., who was born in 2010 (collectively "Children"). The parties reached an agreement on child custody and parenting time in which they would share legal and physical custody of Children. Father agreed to pay child support to Mother in the amount of $350.00 per week. This amount was a deviation from the child-support worksheet based on Father's anticipated partial loss of his income and on the uncertainty of Mother's income while she started her own environmental-consulting business. The parties also agreed to "divide equally the costs of all agreed upon extracurricular activities" for Children. Appellant's App. Vol. II p. 33. Two months after the divorce was finalized, Mother married Chad Grannan ("Stepfather").

In 2015, Mother filed a notice of intent to relocate to Florida, where she currently resides with Stepfather. Mother requested primary physical custody of Children when she relocated. Father objected and requested that he be given primary physical custody of Children. The trial court found that relocation to Florida was not in Children's best interests and granted Father primary physical custody of Children "subject to Mother's parenting time pursuant to the Indiana Parenting Time Guidelines when distance is a major factor." *Id*. at 47.

Mother was also ordered to pay child support to Father in the amount of $283.00 per week. The parties continued to share legal custody and to divide equally the costs of Children's extracurricular activities. After moving to Florida, Mother traveled to Indiana "[a]t least once a month" to exercise parenting time with Children in addition to her holiday and summer parenting time. Tr. Vol. II p. 51. Mother also Skyped with Children "[e]very day. Sometimes more than once a day." *Id*. at 56.

[4] On the evening of December 13, 2017, Mother received a Skype message from A.C. that contained a recording. When Mother played the recording, she heard Father "screaming" and seven-year-old M.C. "crying in the background." *Id*. at 58. As Mother continued to listen to the audio, she began "shaking uncontrollably" and crying. *Id*. Mother could not believe "what [she] was hearing and what was happening to [M.C.]." *Id*. at 59. Mother thought the recording was live, so she called Father's phone to try to "interrupt the situation." *Id*. at 58. She spoke with A.C. and decided to book a flight to Indiana.

[5] Mother arrived in Indiana the following evening. The next day, she went to M.C.'s school and disclosed the recording. M.C.'s principal told Mother to report the recording to the police, which she did, and after playing the recording for Carmel Police Department officers, they contacted the Department of Child Services (DCS). DCS spoke with Children at school regarding an allegation that physical abuse could also be heard on the recording. The allegation of physical abuse was unsubstantiated, and DCS closed its investigation. *See* Ex. 1

p. 40. After the school day ended, Mother arranged to have parenting time with Children over the weekend. On Monday, Mother returned Children to Father. When saying goodbye, Mother mentioned that she would see M.C. at basketball practice that evening. Father said that Mother "wouldn't be seeing [Children] at basketball practice" and told M.C. that "he didn't want Mommy at basketball practice." Tr. Vol II pp. 62-63. Mother responded that she wanted to be there, and Father "immediately became irate and started screaming at [Mother] and slammed the door in [her] face." *Id*. at 63. Father yelled that Mother does not "pay for [Children's] extracurricular activities" so she "need[ed] to stay out of their li[ves]." *Id*. By that point, Children were crying and Mother "didn't know what to do" and "was worried about [Father] taking his anger for [Mother] out on [Children]," so she called the police. *Id*. at 63-64. The police came, spoke with everyone, and left once the situation had deescalated.

[6] Mother returned to Florida, and in January 2018 she filed a petition to modify physical custody, legal custody, and child support. The trial court appointed Catherine Brownson as the guardian ad litem (GAL), and she evaluated Mother, Father, and Children. After the GAL completed her evaluations, she drafted a report recommending that physical custody be modified so that Children can live with Mother in Florida. *See id*. at 24-25. The GAL stated that she did not make this recommendation "lightly" because a change in physical custody would mean that Children "would need to relocate a distance from Father, a distance from friends, and from their current environment." *Id*.

at 25. However, the GAL concluded that she "simply cannot in good conscience recommend [Children] remain in Father's care and custody, as it is not in their best interests." Ex. 1 p. 45.

[7] A hearing on Mother's petition was held in June 2018. The GAL testified and stated that she determined that, in addition to the December 13 incident, Father had engaged in other instances of yelling and cursing at Children—for not flushing the toilet or tying shoelaces properly. *See id*. at 20. The GAL also said that Children told her that they wanted to live with Mother. During the GAL's testimony, Mother's attorney played the recording of the December 13 incident for the trial court. On the recording, M.C. can be heard crying while Father yells, in relevant part:

> God! God d*mn it. I f*cking worked so f*cking hard on it and you just f*cking do that to it. Like a dumb a**. God d*mn it. F*ck. . . . What the f*ck were you f*cking thinking? God d*mn it, dude. I could -- you just f*cked up your f*cking grade. F*ck, you're going to get a bad f*cking grade on there for f*cking doing that. F*cking dumb a**. God. I f*cking work my a** off so you can f*cking get a good grade on that and that's what you f*cking do? You come in and write like f*cking shit like that? You deserve to get the f*cking grade that you get, you know that? I hope you get a f*cking bad grade on it. You know why? 'Cause you only get what you deserve. You deserve a sh*t grade for that sh*t a** writing. You can f*cking do better than that. I know you can f*cking do better than that. You better f*cking do better than that for the rest of your life. Or I'm gonna take away your f*cking Play Station. I'm gonna take away all your f*cking toys. I'm gonna pull you out of basketball and sit you're a** on the bench. Everything you like to do, I'm gonna f*cking take it away if you don't start f*cking working harder in school. You got me?

> You f*cking better get me, because I am f*cking serious. Look at me. I'm really f*cking pissed off right now if you can't tell that. I am really pissed off. I did all that f*cking work and you just come home and just do that like that. That is unacceptable. Unacceptable. You don't do that sh*t in my house. You work f*cking hard in school.

Tr. p. 23. When asked what she thought about the recording, the GAL said that it "is a reflection of what [Children] are experiencing on a regular basis with Father while in his care." *Id.* at 24.

[8] To rebut the GAL's report, Father called three witnesses who testified that they had never seen Father get angry, upset, or frustrated with Children. *See id.* at 140, 143, 147-48. Father also testified and stated that after the December 13 recording ended, he apologized to M.C. On cross-examination, when asked if he believed that the recording constituted verbal abuse, Father responded:

> A    I was cursing at him.
>
> Q    I asked you does that not constitute verbal abuse to you?
>
> A    No.
>
> *****
>
> Q    [W]hat to you constitutes verbal abuse if that does not?
>
> A    I would constitute verbal abuse as something being repetitively, coming at somebody and berating them repetitively. I would consider that verbal abuse.

*Id*. at 210-11. When asked about the incident when Mother said she was coming to M.C.'s basketball practice, Father responded that Mother had "provoked [him]" by "pushing [his] buttons" and that "it was an ongoing thing," her "not assisting to pay for some activities, and [Mother] knew that." *Id*. at 206-07. Father also stated that he questioned the accuracy of the GAL's report because he believed that Mother "asked [Children] to say certain things and to give certain responses to" the GAL. *Id*. at 214.

[9] Mother testified at the hearing regarding her request to modify child support. Mother said that after she moved to Florida in July 2015, she had a job making $70,000 per year for nine months. *See id*. at 74. Mother stated that she lost that job in June 2016 and now owns her own environmental-consulting business and works as a realtor. Mother said that she has worked as an environmental consultant "since about 2007" and that her current income is $733 per week, or approximately $38,000 per year, which is "what [she] made in the past," except during her first nine months in Florida. *Id*. at 44. Mother also said that her expenses are $1647.55 per week. *See id*. at 83. When asked how she makes up the difference between her income and expenses, Mother responded, "My husband." *Id*. at 84.

[10] At the conclusion of the testimony, the trial court found that it is in the best interests of Children that custody be modified so that Mother has primary physical custody of Children with Father to have parenting time "as the parties may agree, but not less than the parenting time guidelines where distance is a

major factor." *Id*. at 243-44. The trial court explained its reasons for modifying physical custody, stating in part:

> [R]eading a transcript is one thing; hearing it is another. I don't think that there is anyone with an objective mind that can hear the recording of what happened on December 13, 2017 and come away with a different conclusion other than it was a horrifying and egregious display of abuse. . . . That incident presented a clear threat to [Children]. . . . [That] was by all estimates a display of emotional and verbal, mental abuse to [Children]. . . . [December 13th] was a traumatic incident and you have minimized it and failed to acknowledge it. You have. You have failed to acknowledge it for the effect that it has had on [Children]. Your response to that has been to minimize and move on. . . . I believe that this is part of what I have seen in the evidence here today and that is overall a lack of self-awareness on your part. There is a lack of self-awareness with regard to the severity and effects of that incident.

*Id*. at 240-42. The trial court also ordered Father to pay Mother child support in the amount of $270.00 per week. The trial court did not modify legal custody or the parties' agreement to divide equally Children's extracurricular expenses. However, the trial court did admonish both parties to follow the court's order regarding extracurricular expenses.

[11]     Father now appeals.

# Discussion and Decision

[12]     Father raises two arguments on appeal. He contends that the trial court erred by granting Mother primary physical custody of Children and by failing to

impute income to Mother when determining the parties' child-support obligations.

[13] The issues Father raises are all decisions that rest within the sound discretion of the trial court, and we will reverse only upon a showing that the trial court has abused its discretion. *See In re Paternity of Snyder*, 26 N.E.3d 996, 998 (Ind. Ct. App. 2015) ("We review custody modifications for abuse of discretion, with a preference for granting latitude and deference to our trial judges in family law matters."); *In re Paternity of C.B.*, 112 N.E.3d 746, 761 (Ind. Ct. App. 2018) ("We will reverse a trial court's decision regarding imputation of income only for an abuse of discretion."), *trans. denied*. An abuse of discretion occurs "when the decision is clearly against the logic and effect of the facts and circumstances that were before the trial court, including any reasonable inferences to be drawn therefrom." *Mertz v. Mertz*, 971 N.E.2d 189, 193 (Ind. Ct. App. 2012), *trans. denied*.

# I. Custody Modification

[14] Father first argues that the trial court abused its discretion when it granted Mother primary physical custody of Children. The trial court may not modify an existing custody order unless the modification is in the best interests of the child and there has been a substantial change in one or more statutory factors. Ind. Code § 31-17-2-21. Indiana Code section 31-17-2-8 lists the statutory factors for a modification of physical custody, including: the age and sex of the child; the wishes of the child's parents; the wishes of the child (with more

consideration given to a child at least fourteen years old); the child's interactions and relationships with any person who may significantly affect the child's best interests; the child's adjustment to the child's home, school, and community; the mental and physical health of all individuals involved in the case; and evidence of a pattern of domestic or family violence by either parent. A change in circumstances "must be judged in the context of the whole environment, and the effect on the child is what renders a change substantial or inconsequential." *Steele-Giri v. Steele*, 51 N.E.3d 119, 127 (Ind. 2016). Mother, as the party petitioning for modification, "bears the burden of demonstrating that the existing custody [arrangement] should be altered." *In re Paternity of Snyder*, 26 N.E.3d at 998.

[15] Father specifically argues that the trial court's conclusion that a substantial change in circumstances had occurred was based on a "single instance of yelling at [M.C.]" that has not had "any deleterious effect" on Children.[1] Appellant's Br. pp. 17, 20. Father further asserts that any other instances where Children alleged that he yelled at them, "at worst," can be "characterized as

---

[1] After the trial court issued its order modifying physical custody, Father filed a motion to correct error alleging that he had an expert conduct an analysis of the recording and that it was his expert's opinion that the recording could not have been sent to Mother in the way she testified it was. The trial court denied Father's motion to correct error. On appeal, Father also contends that the trial court erred in denying his motion to correct error. *See* Appellant's Br. p. 21. Generally, a party may not raise an issue for the first time in a motion to correct error. *Troxel v. Troxel*, 737 N.E.2d 745, 752 (Ind. 2000), *reh'g denied*. Because Father did not raise this issue at trial, we consider this argument waived.

isolated acts of misconduct by the custodial parent which is insufficient to modify custody." Appellant's Reply Br. pp. 7-8. We disagree.

[16] Here, Mother has shown more than isolated acts of misconduct by Father. *Cf. Wallin v. Wallin*, 668 N.E.2d 259, 261 (Ind. Ct. App. 1996) (noting that, generally, "the noncustodial parent must show something more than isolated acts of misconduct to warrant a modification of child custody"). Rather, she has shown evidence that Father has yelled at Children on other occasions when they are in his care—for not flushing the toilet or tying shoelaces properly. *See* Tr. p. 20. The evidence also shows that shortly after the December 13 incident, Father yelled at Mother, in front of Children, for telling M.C. that she would see him at basketball practice. Father testified that he got mad during that incident because Mother "push[ed] [his] buttons." *Id*. at 206.

[17] Furthermore, we agree with Mother that the recording is sufficient grounds for the trial court to modify custody. *See* Appellee's Br. p. 14. For over two minutes, Father screamed, cursed, insulted, and berated his seven-year-old son, who continuously cried in the background. When explaining why it was modifying physical custody, the trial court stated, "I don't think there's anyone with an objective mind that can hear the recording of what happened on December 13, 2017 and come away with a different conclusion other than it was a horrifying and egregious display of abuse." Tr. p. 240-41. Having listened to the recording ourselves, we come away with the same conclusion— that it was a shocking display of verbal abuse. Additionally, when the GAL was asked her opinion of the recording, she testified that the recording "is a

reflection of what [Children] are experiencing on a regular basis with Father while in his care." Tr. p. 24. Evidently, everyone involved in this case—except Father—recognizes that the recording constitutes verbal abuse and is concerned about the emotional harm it has caused Children. As the trial court aptly concluded, Father's response—to minimize the recording—shows a remarkable "lack of self-awareness with regard to the severity and effects" of the incident. *Id*. at 242.

[18] Moreover, the statute specifically authorizes the trial court to consider "all relevant factors," including the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen years old. Ind. Code § 31-17-2-8(3). Here, Children told the GAL that they wished to live with Mother. *See* Tr. p. 13; *see also Collyear-Bell v. Bell*, 105 N.E.3d 176, 186 (Ind. Ct. App. 2018) ("That a child's wishes are to be given more consideration if the child is at least fourteen years old does not mean that the wishes of a child who is not yet fourteen cannot be considered."). Given all this evidence, we find that the trial court did not abuse its considerable discretion in modifying physical custody of Children.[2]

---

[2] Father also argues that the trial court should "have used a remedy less traumatic to [Children], such as referring this matter to [DCS] for an investigation and services." Appellant's Br. p. 25. This argument starts from the premise that remaining in Father's custody and care and participating in a DCS investigation would be "less traumatic" for Children than the modification of custody. Father has given us no reason to think that is true. Ultimately, the same evidence that would support a referral to DCS also amply supports the trial court's decision to modify custody.

# II. Imputed Income

[19] Father next contends that Mother "explicitly rel[ies] on [Stepfather's] income to pay for expenses that would have been covered had she maintained her prior level of income" and that the trial court erred by failing to impute this income to Mother when determining the parties' child-support obligations. Appellant's Br. p. 24. The first step in establishing a child-support award is to determine the weekly gross income of each parent. *In re Paternity of C.B.*, 112 N.E.3d at 757. Indiana Child Support Guideline 3(A)(1) defines weekly gross income as "actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon 'in-kind' benefits." The Guideline's commentary states, "[w]hether or not income should be imputed to a parent whose living expenses have been substantially reduced due to financial resources other than the parent's own earning capabilities is . . . a fact-sensitive situation requiring careful consideration of the evidence in each case." Ind. Child Support Guideline 3(A) cmt. d. The commentary further states:

> [R]egular and continuing payments made by a . . . subsequent spouse . . . that reduce the parent's costs for rent, utilities, or groceries, **may** be the basis for imputing income. If there were specific living expenses being paid by a parent which are now being regularly and continually paid by that parent's current spouse or third party, the assumed expenses **may** be considered imputed income to the parent receiving the benefit.

*Id.* (emphases added).

[20]     Father acknowledges that when Mother moved to Florida in July 2015 she accepted a job "earning $70,000 per year," that in February 2016 Mother was laid off from that job, and that now her income is approximately $38,000 per year and her expenses are $1647.44 per week. Appellant's Br. p. 23. Nonetheless, Father argues that Mother relies on Stepfather to "make-up the gap" between her weekly income and expenses and that the trial court erred by failing to impute Mother's income in an amount equivalent to her expenses when determining her child-support obligation.

[21]     Mother contends that there is "no evidence that [she] is underemployed to avoid paying a higher amount of child support, or that she is underemployed because of Stepfather's income." Appellee's Br. p. 17. Mother reiterates that since she was terminated from her salaried position in 2016, "she has consistently been earning the same amount." *Id*. That is true. *See* Tr. p. 74. The evidence shows that Mother has been an environmental consultant "since about 2007," and that now she owns her own environmental-consulting business and works as a realtor. *Id*. at 44-45; *see also Miller v. Miller*, 72 N.E.3d 952, 956-57 (Ind. Ct. App. 2017) (noting that whether a parent is underemployed and imputing income to him or her is not simply determining that a parent's income level has "remained relatively constant for several years," but also involves finding that the parent made his or her "lifestyle and career choice before or shortly after" they began the relationship and "worked in that profession throughout the relationship" (citing *In re the Paternity of Buehler*, 576 N.E.2d 1354 (Ind. Ct. App. 1991)). Furthermore, while it is also

true that Mother testified that Stepfather "makes up the gap" between her income and expenses, there is no evidence to support Father's claim that Mother is "deliberately suppressing her income" to "the financial detriment" of Children. Appellant's Reply Br. p. 10. We conclude that the trial court did not abuse its discretion by declining to impute income to Mother.

[22] Affirmed.

Mathias, J., and Crone, J., concur.